UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| PARKER JENSEN, <br> Plaintiff, <br><br> v. <br><br> BOARD OF EDUCATION OF BALTIMORE COUNTY, <br> DR. KIMBERLY CULBERTSON, <br> in her official and individual capacities, <br> RICHARD MUTH, <br> in his official and individual capacities, <br> ERIC KNOX, <br> in his official and individual capacities, <br> BALTIMORE COUNTY, <br> BALTIMORE COUNTY POLICE DEPARTMENT, <br> OFFICER SMITH (BADGE #6773), <br> in his official and individual capacities, <br> OFFICER KLAPKA (BADGE #6186) <br> in his official and individual capacities, <br> Defendants. | Case No. 1:25-cv-1106 |

**FIRST AMENDED COMPLAINT**

Plaintiff Parker Jensen, by and through counsel, alleges as follows:

INTRODUCTION

1. In 1992, Deborah Weisman sued her school claiming a rabbi's prayer at her graduation coerced her into religious conformity; the Supreme Court agreed, banning such prayers to protect her freedom. *Lee v. Weisman,* 505 U.S. 577 (1992). Today, Deborah would not need to sue—she'd be hailed a hero by blue-haired ideologues clad in rainbow "Pride" paraphernalia, like those exposed on X by journalists like Libs of TikTok, who teach and run public schools, even in deep-red counties. Students who support Donald Trump, practice authentic Bible-based Christianity, or oppose abortion and transgender ideology now face the same coercive atmosphere Weisman decried. Plaintiff Parker Jensen, an 18-year-old senior at Towson High School and proud

Marine Corps enlistee, embodies the silent struggle of right-wing students nationwide, bullied by left-wing school boards enforcing ideological conformity. During the Biden administration, parents challenging this orthodoxy were branded domestic terrorists by the FBI—leaked communications reveal chilling coordination to silence them.[1] For students like Jensen, it's worse. He was suspended for demanding American flags in classrooms and the right to pledge allegiance, as required by Maryland law; he faced retaliation for championing the military and a secure border, and for defending Donald Trump, and Elon Musk. As this lawsuit details, Jensen's school pushes every left-wing cause, while punishing him for honoring the American flag and expressing his right-wing viewpoint.

2. Plaintiff Parker Jensen, an 18-year-old senior at Towson High School and a recent enlistee in the United States Marine Corps, brings this action to vindicate his constitutional rights under the First and Fourteenth Amendments.

3. Plaintiff is pro-America, pro-military, pro-police, pro-life, and pro-secure borders—positions that place him in an extreme minority at Towson High School, where the overwhelming majority of students and faculty openly advocate left-wing perspectives and express disdain for views like his and hatred for President Donald Trump.

4. Defendants retaliated against Plaintiff for exercising his First Amendment rights to document and challenge the school's failure to comply with Maryland law mandating patriotic observances, as well as its promotion of resources for illegal immigrants, which Plaintiff believes undermines the school's educational mission and student safety.

---

[1] https://judiciary.house.gov/media/in-the-news/house-judiciary-subpoenas-fbi-director-wray-targeting-parents-school-board.

5. This retaliation—including suspension, trespass from public property, and false characterizations of his conduct—stems not only from his protected activities but also from his outspoken dissent against the prevailing ideological orthodoxy of the school, revealing a pattern of viewpoint discrimination against a student whose viewpoints starkly contrasts with the school's dominant culture.

**JURISDICTION AND VENUE**

6. This action arises under the Constitution of the United States, specifically the First and Fourteenth Amendments, and is brought pursuant to 42 U.S.C. § 1983.

7. This Court has jurisdiction over this matter under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).

8. Venue is proper in this Court under 28 U.S.C. § 1391(b) because the events giving rise to this claim occurred within the District of Maryland, specifically in Baltimore County.

**PARTIES**

9. Plaintiff Parker Jensen is an adult citizen of the state of Maryland and a senior at Towson High School.

10. Defendant Board of Education of Baltimore County (Board) is the governing body of BCPS, located at 6901 North Charles Street, Towson, Maryland 21204, tasked with overseeing school policies and ensuring compliance with Maryland law.

11. Defendant Dr. Kimberly Culbertson is the Principal of Towson High School, sued in her official and individual capacities for actions taken under color of state law.

12. Defendant Richard Muth is the School Safety Manager for BCPS, sued in his official and individual capacities for actions taken under color of state law.

13. Defendant Eric Knox is the Executive Director of the Department of School Safety for BCPS, sued in his official and individual capacities for actions taken under color of state law

14. Defendant Baltimore County is a political subdivision of the State of Maryland, responsible for the operation and oversight of the Baltmore County Police Department and other county agencies.

15. Defendant Baltimore County Police Department (BCPD) is a law enforcement agency under the authority of Baltimore County, responsible for policing actions taken against Plaintiff.

16. Defendant Officer Smith (Badge #6773) is a police officer with the BCPD, sue in his official and individual capacities for actions taken under color of state law.

17. Defendant Officer Klapka (Badge# 6186) is a police officer with BCPD, sued in his official and individual capacities for actions taken under color of state law.

## FACTUAL ALLEGATIONS

18. Plaintiff Parker Jensen is an 18-year-old high school senior who enlisted in the United States Marine Corps on March 26, 2025, and has no prior history of suspension from kindergarten through 12th grade.

19. Plaintiff maintains what are considered to be right-wing viewpoints on certain contemporary issues. Very few students in the school maintain similar viewpoints. Plaintiff is not aware of even a single faculty member that maintains similar viewpoints. In Plaintiff's experience, the overwhelming majority of faculty openly express and advocate their left-wing viewpoints and express disdain for right-wing viewpoints.

20. The school's left-wing culture is evident in its actions. BCPS has distributed t-shirts promoting the "Pride" ideology—a left-wing viewpoint.



21.     One of Plaintiff's teachers has blue hair and exemplifies the left-wing archetype highlighted by journalists like the X account Libs of TikTok.

22.     The chosen curriculum for the English class focuses heavily on immigration and is designed to indoctrinate students with left-wing ideology tied to Democratic open-border policies.

23.     Plaintiff has had to endure sitting in class while other students openly attacked political figures like Donald Trump and Elon Musk.

24.     Plaintiff, the captain and quarterback of the School's football team, stayed silent in class discussions during the football season. School policy bars suspended student athletes from playing in two scheduled games. Plaintiff feared that if he openly expressed his support for Donald Trump, Elon Musk, or his right-wing views he would be retaliated against by zealous left-wing faculty members and it could lead to suspension from school and from football. This fear, later proven justified, chilled his speech.

25.     The football season ended on November 3, 2024. The very next day, Plaintiff began making political posts on his Instagram page, displaying his support for Donald Trump. He also posted messages that expressed his anti-abortion and pro-police views. At that time, he also began speaking up in class and defending Donald Trump and Elon Musk when they were attacked during

classroom discussions. Expressing these views made him a target for retaliation and set the stage for what was to follow.

26. On or about February 28, 2025, Plaintiff noticed that certain classrooms at Towson High School, including those of teachers Mr. Sun and Ms. Needer, lacked American flags, in violation of Maryland Education Article § 7-105(c), which mandates that each public-school classroom provide an American flag and patriotic exercises, including the Pledge of Allegiance.

27. Specifically, Maryland Education Article § 7-105 Patriotic Observances, states in pertinent part:

> **Duty of county board to provide American flags and prepare programs for schools**
> (c) Each county board shall:
>
> (1) Provide each public school classroom with an American flag;
>
> (2) Prepare a program for each public school classroom for the beginning of each school day that provides for the salute to the flag and other patriotic exercises that are approved by the United States government; and
>
> (3) Require all students and teachers in charge to stand and face the flag and while standing give an approved salute and recite in unison the pledge of allegiance as follows: "I pledge allegiance to the flag of the United States of America and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all."
>
> **Individuals excused from requirements**
> (d) Any student or teacher who wishes to be excused from the requirements of subsection (c)(3) of this section shall be excused.

28. Plaintiff raised this issue with Assistant Principal Mr. Stevens on or about February 28, 2025, during lunch, showing him the relevant statute. Mr. Stevens acknowledged the concern but took no immediate action.

29. On March 14, 2025, Plaintiff followed up with Mr. Stevens, noting the continued absence of flags in Mr. Sun's classroom. Mr. Stevens responded that some flags were "too big" for classrooms, despite state law and school policy requiring their presence.

30. On or about March 24, 2025, Plaintiff took a picture of the following sign hanging in his school and posted it on his Instagram page.



31. The sign advertises that BCPS provides resources for students who are in the Country illegally. Students are advised to contact the ACLU "for information on what to do if approached by ICE agents." The ACLU website provides advice for to immigrants "regardless of your immigration status on how to "reduce your risk" when "Police or ICE are at my home."

32. Plaintiff believes it is wrong that his school provides support for illegal immigrants in his school. The presence of these additional students who are in the country illegally materially affects Plaintiff because absorbing these students stretches thinner the already scarce resources and increases class sizes making it more difficult for teachers and students. Occasionally, these additional students present disciplinary problems or threats to the safety of other students.

33. The same sign is posted in multiple locations on every floor of the school. There is a large banner-sized copy at the entrance of the school. There are no other messages posted is this pervasive manner throughout the school.

34. Plaintiff raised this issue with an administrator, but no action was taken.

35. There is only one sign that advertises military service, but the military sign has been covered up by a sign for mental health resources so the advertisement for military service cannot be seen. Plaintiff knows that he would be suspended from school if he were to tear down the mental health signs so that students can see the advertisements for the military. On March 24, Plaintiff posted this on Instagram.

36. On March 28, 2025, having received no resolution from his school administration, Plaintiff visited the Baltimore County Board of Education at 6901 North Charles Street, Towson, Maryland 21204, to file a formal complaint against Towson High School's administration for failing to uphold § 7-105, and to discuss the issues with the signs posted in the school with a supervisor.

37. Plaintiff arrived at the Board's Greenwood campus at approximately 11:45 a.m., entering the publicly accessible lobby of Building A, an area open to the public during business hours.

38. Plaintiff used his cell phone to record his interactions with public officials in the lobby.

39. No signs in the lobby prohibited recording.

40. BCPS and the Board were themselves recording Plaintiff a camera posted on the wall while he waited in the lobby.

41. Plaintiff signed a visitor log, providing his name, school, grade, and purpose of visit, and waited peacefully in the lobby for approximately 40 minutes for a supervisor.

42. A supervisor emerged from behind a secure glass door and asked if Plaintiff was recording.

43. Plaintiff confirmed he was, asserting his constitutional right to do so.

44. The supervisor demanded Plaintiff stop recording and leave the building, despite his presence in a public area and lack of disruptive behavior.

45. Plaintiff declined to leave, citing his right to be in a public building to file a complaint.

46. Approximately five minutes later, Police Officer Smith (Badge #6773) and four other officers arrived, responding to a call from Board staff.

47. Plaintiff explained to Officer Smith that he was documenting a complaint against his school administration.

48. Officer Smith asked if Plaintiff had journalist credentials and suggested that Plaintiff could not film without obtaining such credentials

49. Officer Klapka arrived soon after expressly told Plaintiff that Plaintiff was only entitled to the protection of the First Amendment's freedom of the press if he first obtains press credentials.

50. Plaintiff informed Officer Smith and Officer Klapka and other officers that the freedom to gather newsworthy information is a First Amendment right that does not require special credentials.

51. The officers either were not aware or pretended that they were not aware of this clearly established First Amendment right.

52. "The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest." *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (citing *Blackston v. Alabama,* 30 F.3d 117, 120 (11th Cir.1994) (finding that plaintiffs' interest in filming public meetings is protected by the First Amendment); *Fordyce v. City of Seattle,* 55 F.3d 436, 439 (9th Cir.1995) (recognizing a "First Amendment right to film matters of public interest")). *See also Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) ("The filming of government officials engaged in their duties in a public place, including police officers performing their responsibilities … in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting 'the free discussion of governmental affairs.'") (citing *Mills v. Alabama,* 384 U.S. 214, 218 (1966)). Other circuits to consider restrictions on recording have extended First Amendment protection to recording matters of public interest in public spaces because of its connection with speech of public concern. *See, e.g., Glik v. Cunniffe*, 655 F.3d 78, 83 (1st Cir. 2011); *Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3d Cir. 2017); *Turner v. Lieutenant Driver*, 848 F.3d 678, 688–690 (5th Cir. 2017); *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595 & n.4, 600 (7th Cir. 2012); *W. Watersheds Project v. Michael*, 869 F.3d 1189, 1195–1196 (10th Cir. 2017); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000). The Fourth Circuit has done the same, holding the First Amendment protects "livestreaming a police traffic stop." *Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 681 (4th Cir. Feb. 7, 2023).

53. The press generally has no right to information superior to that of the general public. *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 609 (1978); *Lambert v. Polk County,* 723 F.Supp. 128, 133 (S.D.Iowa 1989) ("[I]t is not just news organizations ... who have First Amendment rights to make and display videotapes of events....").

54. Defendant Richard Muth, School Safety Manager, emerged from the building and informed Plaintiff he was now suspended from school and ordered the police to remove Plaintiff from the property.

55. The officers formally trespassed Plaintiff from the property, threatening arrest if he did not leave. Plaintiff complied and left the premises.

56. On March 28, 2025, Defendant Dr. Kimberly Culbertson, Principal of Towson High School, called Plaintiff's mother, Emily Jensen, stating Plaintiff was at the Board, "unhinged," "disrespectful," and "impersonating a journalist," and would be arrested and suspended.

57. On March 28, 2025, Defendant Eric Knox issued a letter barring Plaintiff from all BCPS central office properties, citing "disruptive" and "threatening" behavior, despite video evidence showing Plaintiff's calm demeanor.

58. On March 28, 2025, Dr. Culbertson suspended Plaintiff until April 8, 2025, citing "disruptive behavior," "refusing to cooperate with school rules," and "unexcused absence," though Plaintiff had pre-approved permission from his counselor, Ms. Weir, to be absent that day.

59. Plaintiff received no hearing or opportunity to contest the suspension before it was imposed.

60. Plaintiff's video of the incident, posted on YouTube with over 2,700 views, shows he remained peaceful and respectful and posed no threat to anyone.

61. Defendants' actions have prevented Plaintiff from attending school from April 2, 2025, until April 8, disrupting his education as a senior preparing for Marine Corps service.

62. Upon information and belief, on March 28, 2025, Defendant Richard Muth, School Safety Manager for BCPS, called Defendant Dr. Kimberly Culbertson, Principal of Towson High

School, and the Baltimore County Police Department, falsely stating that Plaintiff Parker Jensen was committing criminal conduct at the Baltimore County Board of Education office.

63. Muth's statements, if made, were false or made with reckless disregard for the truth. Muth knew or reasonably should have known that such statements could lead to Plaintiff's arrest, suspension, or even potential bodily harm by police or others acting on this misinformation.

64. Subsequently, on March 28, 2025, Defendant Dr. Kimberly Culbertson repeated these false statements to Plaintiff's mother, Emily Jensen, claiming Plaintiff was at the Board office engaging in criminal conduct, specifically describing him as "unhinged," "disrespectful," and "impersonating a journalist," and asserting he would be arrested and suspended.

65. Culbertson either knew these statements were false or made them with reckless disregard for the truth, and she knew or should have known they could cause Plaintiff and his mother severe emotional distress.

66. The false statements by Muth and Culbertson were made in a context where damages—including emotional distress, reputational harm, and disruption to Plaintiff's education and family relationships—were foreseeable consequences of their actions.

## CAUSES OF ACTION

### Count I: First Amendment Retaliation (42 U.S.C. § 1983)

67. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

68. Plaintiff engaged in protected First Amendment activity by recording public officials in a public space and reporting a violation of Maryland law by his school administration.

69. Defendants BCPS, Board, Culbertson, Muth, and Knox retaliated against Plaintiff for exercising his First Amendment rights by suspending him, trespassing him from public property, and issuing false statements about his conduct.

70. This retaliation lacked a legitimate basis and was intended to chill Plaintiff's constitutional rights.

71. As a direct result, Plaintiff has suffered loss of education, reputational harm, and emotional distress.

**Count II: Fourteenth Amendment Procedural Due Process (42 U.S.C. § 1983)**

72. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

73. As a public school student, Plaintiff has a property interest in his education and a liberty interest in his reputation, protected by the Fourteenth Amendment.

74. Defendants BCPS, Board, and Culbertson deprived Plaintiff of these interests by suspending him without notice, a hearing, or an opportunity to present his side of the story.

75. The suspension was based solely on unverified statements from Board staff, without review of Plaintiff's video evidence or his pre-approved absence.

76. As a direct result, Plaintiff has suffered loss of education and emotional distress.

**Count III: Defamation (42 U.S.C. § 1983 and Maryland Common Law)**

77. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

78. Defendant Richard Muth knowingly or with reckless disregard for the truth falsely stated to Defendant Dr. Kimberly Culbertson and the Baltimore County Police Department that Plaintiff was committing criminal conduct at the Board office on March 28, 2025. These statements were unprivileged and defamatory per se under Maryland law, as they imputed criminal behavior to Plaintiff.

79. Defendant Dr. Kimberly Culbertson knowingly or with reckless disregard for the truth repeated these false statements to Plaintiff's mother, Emily Jensen, on March 28, 2025,

further asserting that Plaintiff was "unhinged," "disrespectful," and "impersonating a journalist," thereby amplifying the defamatory impact.

80. Muth's and Culbertson's false statements were made under color of state law and foreseeably caused Plaintiff reputational harm, emotional distress, and disruption to his education, as well as emotional distress to his family.

81. Muth knew or should have known his statements could lead to Plaintiff's arrest, suspension, or bodily harm, and Culbertson knew or should have known her statements would cause Plaintiff and his mother severe emotional distress.

82. As a direct and proximate result, Plaintiff suffered damages, including but not limited to emotional distress, reputational injury, and interference with his educational and familial relationships.

### Count IV: First Amendment Prior Restraint (42 U.S.C. § 1983)

83. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

84. Defendants Baltimore County and Baltimore County Police Department maintain a policy, custom, or practice requiring citizens to obtain "press credentials" prior to filming public officials performing their official duties in public spaces.

85. Officers Smith and Klapka enforced this requirement against Plaintiff on March 28, 2025, by informing him that he needed "press credentials" to record, despite his clear First Amendment right to do so without such credentials.

86. This policy constitutes an unconstitutional prior restraint on Plaintiff's First Amendment rights, as it imposes a prerequisite condition on the exercise of protected speech and recording activities.

87. As a direct result, Plaintiff was prevented from documenting public officials, chilled in his expressive activities, and suffered emotional distress.

### Count V: First Amendment Failure to Train (42 U.S.C. § 1983)

88. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

89. To the extent that no official policy requiring "press credentials" exists, Defendants Baltimore County and Baltimore County Police Department failed to adequately train Officers Smith and Klapka regarding the First Amendment rights of citizens to record public officials in public spaces without credentials.

90. This failure to train reflects deliberate indifference to the constitutional rights of citizens, as evidenced by the officers' fabricated assertion on March 28, 2025, that Plaintiff needed "press credentials" to film, a requirement with no basis in law.

91. As a direct result, Plaintiff's First Amendment rights were violated, and he suffered emotional distress and reputational harm.

Count VI: First Amendment Violation by Officers Smith and Klapka (42 U.S.C. § 1983)

92. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

93. To the extent that no official policy requiring "press credentials" exists, Defendants Officer Smith and Officer Klapka, acting in their individual capacities under color of state law, fabricated this requirement from whole cloth on March 28, 2025, to prevent Plaintiff from filming public officials performing their duties.

94. This action violated Plaintiff's clearly established First Amendment right to record matters of public interest in a public space, as recognized by multiple federal circuits, including the Fourth Circuit *in Sharpe v. Winterville Police Dep't*, 59 F.4th 674 (4th Cir. 2023).

95. Officers Smith and Klapka acted with reckless disregard for Plaintiff's constitutional rights, and their conduct was not objectively reasonable.

96. As a direct result, Plaintiff was prevented from exercising his First Amendment rights and suffered emotional distress.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Declare that Defendants violated Plaintiff's First and Fourteenth Amendment rights.

B. Permanently enjoin Defendants from retaliating against Plaintiff for exercising his constitutional rights and from denying him due process.

C. Award compensatory damages for loss of education, emotional distress, and reputational harm in an amount to be determined at trial.

D. Award reasonable attorney's fees and costs under 42 U.S.C. § 1988.

E. Grant such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 10, 2025

Respectfully submitted,

/s/ Jonathan Gross  
Jonathan Gross  
MD Bar ID: 1912170138  
LAW OFFICE OF JONATHAN GROSS  
2833 Smith Ave., Suite 331  
Baltimore, MD 21209  
(443) 813-0141  
Jonathansgross@gmail.com

/s/ Sarah Spitalnick  
Sarah Spitalnick  
MD Bar ID: 23112901  
LAW OFFICE OF SARAH SPITALNICK  
23 Walker Ave., Suite 207  
Baltimore, MD 21208  
(484) 332-0454  
sarahspitalnickesq@gmail.com